UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LAURENCE A. LONG,

        Plaintiff,                          Case No. 12-cv-15586

v                                                    Honorable Thomas L. Ludington

COUNTY OF SAGINAW, and
WILLIAM FEDERSPEIL,

        Defendants.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Lawrence Long, an attorney, alleges that members of the Saginaw County Sheriff's Office violated his Fourth Amendment and related state law rights by videorecording his meeting with a client in a classroom at the Saginaw County Jail and by having a deputy sit in on a meeting with a client in the Saginaw County Courthouse.

Defendants have moved for summary judgment on Long's federal and state law claims. Because there is a material issue of fact regarding whether Long had a reasonable expectation of privacy while meeting with his client in the Saginaw County Jail, summary judgment on his Fourth Amendment claim will be denied. However, because Long did not have a reasonable expectation of privacy while meeting with his client in the Saginaw County Courthouse with a deputy present and because Defendants are entitled to immunity from Long's state law claims, Defendants' motion for summary judgment will be granted as to those claims.

**I**

Laurence Long is an attorney licensed to practice in Michigan. Plaintiff has been in private practice since November 25, 1986, and practiced in several areas of law. As part of his practice, Long accepted appointments pursuant to the Saginaw County Circuit Court's Plan for Appointment of Counsel for Indigent Parties. Three months before the events of this case, in December 2011, Long qualified to be placed on a list to be appointed by the Saginaw County Circuit Court to represent criminal capital offenses.

**A**

In February 2012, Diane Messing retained Long to represent her in her divorce case. Long was subsequently appointed to Ms. Messing's criminal case after she was arrested on two counts of operating a vehicle while intoxicated. After her arrest, Ms. Messing was detained in the Saginaw County Jail.

On March 25, 2012, Long visited Ms. Messing and another client in the Saginaw County Jail. Upon his arrival, Long asked Corrections Officer Stanley Powell if Ms. Messing had been seen by medical personnel as Long had requested on the previous Friday, March 23, 2012. Officer Powell responded that Ms. Messing had been seen by medical personnel.

Sergeant Ebony Rasco, who was also present during Long's inquiries into Ms. Messing's condition, became "alarmed" because Long "asked if his client received medical attention and the frequency with which he visited his client." ECF No. 21 at 3. Concerned with Long's behavior, Sergeant Rasco had corrections officers place Long in a room known as the "small classroom," which is commonly used for court video arraignments.

Sergeant Rasco acknowledged that she placed Long in the small classroom because she would be able to observe Long's interaction with Ms. Messing through video surveillance.

Long's meetings with Ms. Messing were videotaped and recorded from a remote location by Defendants. The recordings were silent; they did not record any audio.

Neither Sergeant Rasco nor any other corrections officer informed Long that they were recording his meetings. Saginaw County Jail does not have any signs indicating that the small classroom's surveillance camera is on or that it is recording. Moreover, at least two other criminal defense attorneys acquainted with the Saginaw County Jail were surprised to learn that their client meetings had been recorded.

Sergeant Rasco watched the video feed as officers brought Ms. Messing to the small classroom. She explains that Long and Ms. Messing greeted each other with a hug and then sat down "very close to one another in a familiar sort of way." ECF No. 21 Ex. 3. Sergeant Racso "thought the hug was inappropriate for an attorney and his client." *Id*. She observed Long and Ms. Messing walk out of view of the camera for several minutes, and then Long pressed the call button so that the officer could retrieve Ms. Messing. *Id*.

After observing Long's interaction with Ms. Messing, Sergeant Rasco went back to view prior video footage of Long's visits with Messing. She discovered that on March 19, 2012, Ms. Messing had hugged Long and kissed him on the cheek during a meeting.

Sergeant Rasco informed the jail administrator, Captain William H. Gutzwiller, that she had observed inappropriate contact between Long and Messing. Captain Gutzwiller banned Long from visiting Ms. Messing inside the Saginaw County Jail and also decided that if Long wanted to see Ms. Messing, a court transport officer could bring her to the courthouse for a meeting.

Captain Gutzwiller then spoke with Judge Kaczmarek, the Saginaw County Chief Circuit Judge at the time, regarding the allegations against Long. During the conversation, Captain

Gutzwiller denied that Long and Ms. Messing had engaged in any "sexual stuff": "I said I didn't say it was sexual, sir, I said it was inappropriate." ECF No. 21 Ex. 7 at 8.

After the conversation with Captain Gutzwiller, Judge Kaczmarek requested an investigation into Long's conduct on the video recording. Judge Kaczmarek removed Long from the Saginaw County Circuit Court's Plan for Appointment of Counsel for Indigent Parties. Long was also replaced as Ms. Messing's attorney of record in her criminal cases. Even though he had been replaced as Ms. Messing's criminal defense attorney, Long continued to represent Ms. Messing in her divorce proceedings.

**B**

Although Long was no longer permitted to meet with Ms. Messing at the Saginaw County Jail, he continued to meet with her at the Saginaw County Courthouse. Long was not allowed to meet with Ms. Messing alone, however; instead, a deputy was required to be present in the same room when the meetings took place:

> Q:         At one point did Mr. Long ask if he could meet in private with Ms. Messing?
>
> Biniecki:  He did.
>
> Q:         And did you deny that request?
>
> Biniecki:  It would be against policy and procedure to allow that to happen.

ECF No. 21 Ex. 10 at 16. Deputy Biniecki then explains that during the meeting, "I was in the room with them, so when they talked loud enough to hear I could overhear it. Sometimes they were whispering and stuff that you couldn't overhear." *Id.* at 17. Deputy Biniecki estimated that the room was "approximately 15 by 15" feet in size. *Id*. Each time Long met with Ms. Messing at the Saginaw County Courthouse, Deputy Biniecki sat in on their meetings and took notes on their interactions.

On November 1, 2012, the Attorney Grievance Commission decided that the investigation into Long's alleged improper conduct did not warrant further action by the Commission and closed the investigation.

## II

Despite the Court's specific direction in its previous Order granting Defendants' motion to dismiss, Defendants have again filed a motion titled "Motion to Dismiss or, in the alternative, Motion for Summary Judgment." To reiterate: these motions are not interchangeable, and the distinction between them is not trivial, and Defendants take unnecessary risks leaving the Court to guess about the Defendants' analysis. Nonetheless, because Defendants insist on obfuscating, the Court will do just that—guess as best it can.

At first, it appears that Defendants intend the motion to be one to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) because there is not a single exhibit to their motion. *See* ECF No. 31. Yet, at various points throughout their brief, Defendants refer to exhibits previously attached to their first motion to dismiss, or in the alternative, motion for summary judgment. *See id.* at 16. And while Long only attaches a single exhibit, his response nonetheless also refers to several exhibits previously attached to his first response to Defendants' first motion. *See* ECF No. 33 at 16 n. 5. Because the parties have relied on documents extraneous to the pleadings, the Court will construe Defendants' motion as a motion for summary judgment. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) ("On a motion to dismiss, a court may accept matters outside the pleadings, but in doing so it generally must treat the motion as one for summary judgment under Rule 56.") (quotations omitted).

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

### III

Long's amended complaint asserts four causes of action against each Defendant: (1) violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983; (2) violation of Michigan's Eavesdropping Statute; (3) violation of Michigan public policy; and (4) invasion of privacy.[1] Each claim will be addressed seriatim.

### A

Long first claims that Defendants violated his Fourth Amendment rights by conducting unlawful searches during his meetings with his client, Ms. Messing. Specifically, he claims that Defendants conducted two unlawful searches by "(1) recording confidential meetings with his

---

[1] The Court notes that, although it permitted Long to file an amended complaint after dismissing the original complaint, Long omitted several state law claims from his amended complaint. For example, in his original complaint Long alleged five causes of action under state law: violation of the Michigan Eavesdropping Statute, violation of the Michigan Anti-Hacking Law, invasion of privacy, gross negligence, concert of action, and vicarious liability. Long omits the latter three causes of action from his amended complaint. Because amended pleadings supersede original pleadings, "the original pleading no longer performs any function in the case and any subsequent motion made by an opposing party should be directed at the amended pleading." 6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1476 (3d ed. 2010). Thus, when a plaintiff voluntarily amends his complaint, as here, a court may consider only the amended complaint. *Clark v. Johnston*, 413 F. App'x 804, 811-12 (6th Cir. 2011). Long voluntarily amended the complaint, and in doing so he chose to omit several of his state-law claims. Accordingly, the Court is limited to addressing the claims made in his amended complaint.

client inside the County jail; and (2) eavesdropping upon and recording confidential conversations of Plaintiff and his client inside the County Courthouse." Compl. ¶ 43.

The Fourth Amendment protects individuals from "unreasonable searches and seizures." U.S. Const. Amend. IV. Under *Katz v. United States*, there is a two-part test to determine whether a search has occurred: First, the individual must have exhibited an actual (subjective) expectation of privacy, and, second, the expectation must be one that society is prepared to recognize as reasonable. 389 U.S. 347, 361 (Harlan, J., concurring). Accordingly, to survive Defendants' motion for summary judgment, Long must show that, at a minimum, there is a material issue of fact regarding whether he had a reasonable expectation of privacy while meeting with his client in the Saginaw County Jail and in the Saginaw County Courthouse.

i

Defendants first argue that no Fourth Amendment search occurred when jail officials recorded Long's conversation with his client in the Saginaw County Jail. Specifically, they argue that "visual security surveillance of prisoners does not constitute a search within the meaning of the 4th Amendment." To support their argument, Defendants rely on the Sixth Circuit's opinion in *Kent v. Johnson*, 821 F.2d 1220, 1229 (6th Cir. 1987).[2]

However, *Kent* stands for the contrary proposition: that surveillance of prisoners can, at least facially, constitute a search under the Fourth Amendment. The court in *Kent* held that a Fourth Amendment challenge to a prison policy requiring naked male prisoners to expose themselves to regular and continuous surveillance by female officers was facially valid: "Literally, the issue is the reasonableness of the surveillance by female prison guards of plaintiff's person in various states of undress. Couched in fourth amendment terms, the inquiry

---

[2] The Court first notes that Defendants appear to be paraphrasing language found not in the majority opinion, but rather in Judge Krupansky's dissent. The dicta in Judge Krupansky's dissent is, of course, not binding.

becomes whether plaintiff has a reasonable expectation of privacy from such 'searches.'" *Kent* at 1226. The *Kent* court ultimately concluded that the prisoners' Fourth Amendment claim based on visual surveillance could survive a motion to dismiss. Accordingly, Defendants' reliance on *Kent* is without merit, because it supports Long's contention that the visual surveillance of his meeting with Ms. Messing could qualify as a search under the Fourth Amendment.

Because "the Fourth Amendment protects people, not places," *Katz*, 389 U.S. at 352, it is not dispositive that Long's conversation took place within a jail. "[I]n the prison setting, attorney-client communications generally are distinguished from other kinds of communications and exempted from routine monitoring." *Lonegan v. Hasty*, 436 F. Supp. 2d 419, 432 (E.D.N.Y. 2006); *see also Evans v. Inmate Calling Solutions*, 2011 WL 7470336, at *15 (D. Nev. July 29, 2011) ("[I]t is objectively reasonable for confidential communication between an inmate and his attorney to remain private."); *Sowards v. City of Milpitas*, 2005 WL 1566540, at *3 (N.D. Cal. July 5, 2005) (holding that the police violated the Fourth Amendment by recording an attorney-client conversation in an interrogation room). Indeed, the need for confidential attorney-client communications and the informed legal assistance they facilitate is no less pressing in a police station or jailhouse setting than in other circumstances. *See Lanza v. State of New York*, 370 U.S. 139, 143-44 (1962) ("[I]t may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.").

In light of the caselaw authority, although Long's communications with his client occurred within the Saginaw County Jail, he may have had a subjective expectation of privacy in those communications.[3] The conversation concerned legal matters for which Long had been

---

[3] The Court notes that, in the sparse deposition transcripts provided, Long does not ever actually say that he subjectively believed that his conversation with Ms. Messing would be confidential. Indeed, the only piece of

- 8 -

hired by his client, and therefore the attorney-client privilege attached to those communications. *See In re State Police Litigation*, 888 F. Supp. 1235, 1256 (D. Conn. 1995) ("[W]here no consent exists, and where conversations consist of privileged communications between clients and their attorneys, an expectation of privacy is reasonable."). Accordingly, Long maintains that he had a subjective expectation of privacy based on the confidentiality surrounding attorney-client communications.

Long claims that his expectation of privacy was reasonable because there were no indications that his conversation would be recorded or monitored. Captain Gutzwiller testified that there were no verbal or visual warnings given to attorneys that their actions in the small classroom may be recorded:

> Q: Is there any warning that's given to the lawyers that use [the small classroom] as opposed to other rooms that don't have video monitors that their motion will set off this monitor to you know record them?
>
> Gutzwiller: Do I have a specific sign in that room that says you're subject to monitoring, recording no, sir, I do not.
>
> Q: Is there anything in the other rooms upstairs that say that, you know where the attorneys don't have a video in the room?
>
> Gutzwiller: No, sir.

Gutzwiller Dep. at 27. Indeed, as a local criminal defense attorney, Long and his colleagues were unaware that their client meetings in the Saginaw County Jail were recorded:

---

evidence that could be construed as a subjective belief is when Long explains that "Every attorney that I talked to regarding [recording client meetings] voiced total surprise that that was happening . . . ." The Court thus must connect the dots to conclude that, if every other attorney in the area was surprised and had a subjective belief that the meetings were confidential, then Long did, too.

Moreover, when asked a question that could have revealed whether he had a subjective expectation of privacy, Long does not respond. The deponent asked: "Would you have ever met with your client if you thought – well let me ask you this: At some point you withdrew from representing her; is that right?" Long never answers the original question.

> Q: It's your understanding that the lawyers that are criminal lawyers in this town couldn't even believe it when they found out that they were being videotaped by Ms. Rasco or I mean Sergeant Rasco. . . .
>
> Long: Every attorney that I talked to regarding this issue voiced total surprise that that was happening, as well as they're not having knowledge of it.

Long Dep. at 93.

However, Defendants dispute Long's contention that there was no indication that his meetings would be recorded or observed. Although Captain Gutzwiller testified that there were no posted signs informing attorneys that their actions could be recorded, Sheriff Federspeil notes that there is an "open and obvious" videocamera located in the upper corner of the small classroom. Federspeil Affidavit ¶ 7. During Sergeant Rasco's deposition, she provided further details about the small classroom's videocamera:

> Q: Now, is there anything on the video camera in the small classroom that would suggest that it was on, if it was on, if you were to look at it? Like is there a red light that's on, you know, anything like that?
>
> Rasco: No, it's a surveillance camera, so no, none of that.
>
> Q: What is the difference between a surveillance camera and the type of camera I was describing?
>
> Rasco: This camera is on 24 hours a day, 7 days a week. It runs all day.
>
> Q: Is this on a television set, or is it on a wall, or where is it?
>
> Rasco: It's on the wall.

Rasco Dep. at 23. Thus, Defendants appear to argue that because the videocamera was open and obvious, Long's expectation of privacy was unreasonable.

Taking the facts in a light favorable to Long, the non-movant, the Court concludes that there is a genuine issue of fact regarding whether Long had a reasonable expectation of privacy

in the small classroom while meeting with his client.[4] No signs warned of the possibility of surveillance, neither attorneys nor their clients were told of the possibility of surveillance, and there were no indications that the camera in the small classroom was on or recording the events. Given the lack of warning about the possibility of surveillance and the highly confidential nature of attorney-client communications, there is an issue of fact regarding whether Long had a reasonable expectation of privacy in his communication with Ms. Messing in the small classroom at the Saginaw County Jail.

Nevertheless, even assuming that Long had a reasonable expectation of privacy and that Defendants' violated his Fourth Amendment rights, Defendants contend that the surveillance is nonetheless valid because it is reasonably related to a legitimate penological interest. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). In *Turner*, the Supreme Court held that "when a prison regulation impinges on *inmates'* constitutional rights, the regulation is valid if it is reasonably related to a legitimate penological interest." *Id.* (emphasis added). By its own terms, however, *Turner* addresses an inmate's constitutional rights—not a visitor's or an inmate's attorney's. Defendants have not provided any citations to cases where courts have applied *Turner*'s legitimate penological interest test to the violation of a non-inmate's constitutional rights.[5] Although many of the same reasons justifying prison authorities overriding prisoners' rights remain when a visitor enters a penitentiary (security, prevention of contraband, safety), this Court nonetheless declines to be the first court to apply *Turner's* legitimate penological interest

---

[4] At the settlement conference, representations were made regarding the content of the videorecording of Long's meetings with his client. For example, Defendants claim that Long knew that the videocamera was in the small classroom and was working because he looked at the camera and pointed directly toward it. If this is true, the evidence could affect the outcome of this motion and case. However, neither party has submitted the recording for the Court to consider on the motion for summary judgment—or any other evidence substantiating that claim—and therefore the Court cannot consider the information.

[5] After an independent review, the Court has found only one case purporting to apply the legitimate penological interest test to a non-inmate. In *Armstrong v. Davis*, the Ninth Circuit assumed without deciding that Turner's test applies to "inmates inside the prison and the parolees on the outside." 275 F.3d 849, 874 (9th Cir. 2001).

test to jail visitors because there are also reasons justifying a distinction between inmates' rights and licensed legal counsel's rights.

Moreover, the Court notes that when the Sixth Circuit has considered the Fourth Amendment rights of visitors in penitentiaries, the Sixth Circuit has not used the *Turner* analysis to determine whether the legitimate penological interests override a visitor's Fourth Amendment constitutional rights. *See Spear v. Sowders*, 71 F.3d 626, 629-30 (6th Cir. 1995); *McPherson v. Kelsey*, 125 F.3d 989, 993 (6th Cir. 1997). Long has provided sufficient evidence to create a material issue of fact regarding whether he had a reasonable expectation of privacy, and the Defendants' contention that they had legitimate penological reasons for recording his meeting with Ms. Messing is not a defense. Accordingly, summary judgment will be denied as to this claim.

### ii

Long also claims that Defendants violated his Fourth Amendment rights by sitting in on and taking notes on his meetings with Ms. Messing in the Saginaw County Courthouse. As explained above, the Fourth Amendment protects people, not places, and therefore the Court must determine whether Long had a reasonable expectation of privacy in his client-meeting at the County Courthouse.

In the Courthouse, Long met with Ms. Messing in the presence of Deputy Biniecki—who was, in his estimation, about 15 feet away from the two. Biniecki Dep. at 17. Biniecki specifically denied Long's request to meet with Ms. Messing privately:

> Q: At one point did Mr. Long ask if he could meet in private with Ms. Messing?
>
> Biniecki: He did.
>
> Q. And did you deny that request?

> Biniecki: It would be against policy and procedure to allow that to happen.
>
> Q: Why is that?
>
> Biniecki: I have to maintain visual of our inmate.

Dep. at 16. Even before conversing with his client, then, Long knew that the conversation would not be held privately because a sheriff's deputy would be present.

And during the meeting with Ms. Messing, Deputy Biniecki was only about 15 feet away—close enough to hear Long and Ms. Messing:

> Q: Could you hear what they were talking about?
>
> Bieniecki: I was in the room with them, so when they talked loud enough to hear I could overhear it. Sometimes they were whispering and stuff that you couldn't overhear.

Dep. 17. Although Deputy Biniecki could not hear every word of Long's conversation, he still managed to take notes on the conversation. Dep. 17.

Even assuming Long had a subjective expectation of privacy while meeting with Ms. Messing in the County Courthouse, this subjective expectation was not objectively reasonable. Deputy Biniecki explicitly denied his request to meet with Ms. Messing privately, sat less than 15 feet away from Long during his meeting, and was close enough to take notes on the conversation. Although Long's repeatedly emphasizes the importance of the attorney-client privilege and the need for such communications to be kept confidential, he has not identified any legal authority to support the proposition that he could possess a reasonable belief that his meeting with Ms. Messing was confidential, despite the presence of a sheriff's deputy sitting 15 feet away from them. Indeed, the instant claim is distinguishable from cases where courts have found an attorney's expectation of privacy reasonable because, in those cases, the attorneys were unaware that their conversations with clients would be monitored. *See Lonegan v. Hasty*, 436 F.

Supp. 2d 419, 435-36 (E.D.N.Y. 2006) (stating that the defense attorneys were told that the video cameras in the Visiting Area were not recording their conversations with the detainees); *Sowards v. City of Milpitas*, 2005 WL 1566540, at *3 (N.D. Cal. July 5, 2005) (stating that "[t]here is no indication in the record that [the officer] informed [the inmate[ that he was going to tape record the conversation . . ."); *United States v. Mitchell*, 2013 WL 3808152, at *13 (M.D. Fla. July 22, 2013). ("the Court concludes that the explicit warning to Defendant that his conversations with [his attorney] were recorded vitiates any argument that he reasonably could have expected the phone calls to remain confidential for purposes of the attorney-client privilege."). Accordingly, assuming that Long had a subjective expectation of privacy while meeting with his client in the County Courthouse, this expectation was objectively unreasonable. Accordingly, Defendants' motion for summary judgment on this claim will be granted.

**B**

In addition to Long's Fourth Amendment claims, he also asserts several state-law claims against Sheriff Federsepeil and Saginaw County, including violation of Michigan's Anti-Hacking Law, violation of Michigan public policy, and invasion of privacy. Defendants contend that they are entitled to immunity from these state law claims based on Michigan's Governmental Tort Liability Act ("GTLA").

As a general rule, governmental agencies and employees are immune from tort liability when they are engaged in governmental functions. *See* Mich. Comp. Laws § 691.1401 et seq. Long, however, claims that neither Sheriff Federspeil nor the County of Saginaw is entitled to immunity from suit under Michigan law. Each Defendant's entitlement to immunity will be addressed.

i

Defendant Federspeil, as Sheriff of Saginaw County, is one of the highest-elected officials, entitling him to absolute immunity from tort liability when he is acting within the scope of his authority. *Ross v. Consumers Power Co (On Rehearing)*, 363 N.W.2d (1984); Mich. Comp. Laws § 691.1407(5). In determining whether Sheriff Federspeil was acting within the scope of his authority, the Court must look to a number of factors, including: (1) the nature of the alleged acts; (2) the statutes, ordinances, and other laws defining the official's authority; and (3) the structure and allocation of power at that level of government. If Sheriff Federspeil was indeed acting within the scope of his authority, his conduct is immune from all tort liability—even intentional torts. *See Marrocco*, 431 Mich. at 711.

Here, Defendant Federspeil was acting within the scope of his authority under Michigan Law. Michigan Comp. Law § 51.75 explicitly provides that "[t]he sheriff shall have the charge and custody of the jails of his county, and of the prisoners in the same . . . ." In matters pertaining to the conditions of jails and to the operation of deputies, the sheriff is the policymaker for the county. *Id.*; Mich. Comp. Laws § 51.281 (sheriff prescribes rules and regulations for conduct of prisoners); *Kroes v. Smith*, 540 F. Supp. 1295, 1298 (E.D. Mich. 1982) (the sheriff of "a given county is the only official with direct control over the duties, responsibilities, and methods of operation of deputy sheriffs"). Because Sheriff Federspeil was acting within the scope of his authority by controlling and creating policy for the Saginaw County Jail and for deputies in the Saginaw County Courthouse—including surveillance of lawyer-client meetings—he is entitled to absolute immunity unless one of the exceptions applies.

Long first argues that Sheriff Federspeil engaged in ultra vires actions, thereby removing his entitlement to absolute immunity. More specifically, Long argues that Sheriff Federspeil

violated the Michigan Constitution, which is an inherently ultra vires action. Governmental immunity is not a defense to a claim that a state agency or actor, by virtue of policy or custom, violated rights conferred by the Michigan Constitution. However, the circumstances under which such claims can be successfully asserted are limited.

The Court need not address the limitations on this exception to immunity, however, because Long's amended complaint does not include any allegation that Long violated any part of the Michigan Constitution. Rather, Long's amended complaint alleges violations of Michigan's Eavesdropping Statute, Michigan Public Policy, and Invasion of Privacy. Despite Long's cursory allegation that each of these claims involves a "violation of the Michigan and federal Constitution," not one of these claims is derived from the Michigan Constitution. First, the Michigan Eavesdropping Statute is part of the Michigan Penal Code. Second, a claim under Michigan's public policy is, as Long's amended complaint admits, an equitable remedy in which "court will infer a civil remedy to further the ultimate policy for the protection of individuals and which the Legislature must have had in mind." Compl. ¶ 82 (citing *Gerdner v. Wood*, 429 Mich. 290, 301 (1987)). Finally, Michigan has long recognized that a claim of invasion of privacy is based on common-law tort principles, not the Michigan constitution. *Lewis v. LeGrow*, 670 N.W.2d 675, 687 (Mich. Ct. App. 2003). Accordingly, Long's claims under Michigan's Eavesdropping Statute, Michigan Public Policy, and for Invasion of Privacy are not derived from the Michigan Constitution, and therefore this exception to absolute immunity does not apply.

Long also attempts to bootstrap a claim under the Michigan Constitution to his Fourth Amendment Claim under the federal Constitution: "*Although Plaintiff claimed in the instant cause of action that Defendants' actions violated the federal constitution*, Michigan has interpreted its corollary provision in Article 1, Section 11 of the Michigan Constitution of 1963

as providing 'the same protection as that secured by the Fourth Amendment.'" Resp. at 22-23 (citing *People v. Collins*, 438 Mich. 8, 25 (1991)) (emphasis added). Despite the alleged similarity between the federal Constitution's Fourth amendment and Michigan's Constitution, Long did not assert a claim under Article 1, Section 11 of the Michigan Constitution. Indeed, as noted above, Long admits that his complaint states a claim only under the federal Constitution, not the Michigan constitution. Because the Court can only address claims actually raised in Long's amended complaint, Long did not assert a claim under Michigan's constitution and the exception to absolute immunity does not apply.

In sum, Sheriff Federspeil is entitled to absolute immunity for his actions regarding the oversight and policymaking for the Saginaw County Jail. Because Long is not asserting that Sheriff Federspeil violated his rights under the Michigan constitution, that exception to absolute immunity does not apply. Accordingly, Sheriff Federspeil is immune from liability regarding Long's claims under the Michigan Eavesdropping Statute, Michigan Public Policy, and for Invasion of Privacy.

**ii**

In general, a governmental agency such as Saginaw County is immune from liability for injury caused by its tortious conduct if, at the time of the tort, the agency is engaged in an activity that constitutes a government function as defined in the GTLA. According to the GTLA, a "governmental function" is:

> an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law. Governmental function includes an activity, as directed or assigned by his or her public employer for the purpose of public safety, performed on public or private property by a sworn law enforcement officer within the scope of the law enforcement officer's authority.

Mich. Comp. Laws § 691.1401(f). The GTLA's definition of governmental function is thus interpreted broadly and encompasses most of the activities performed by governmental agencies. *Siddock v. Grand Trunk Western R.R. Inc.*, W.D. Mich. 2008, 556 F. Supp.2d 731. Any exceptions to the broad interpretation are narrowly construed. *Duncan v. State*, 774 N.W.2d 89 (2009).

When determining whether a governmental agency is performing a governmental function, a court should focus on the general activity, not on the specific conduct giving rise to the complaint. *Siddock*. Because it operates the Saginaw County Jail, Defendant Saginaw County was engaged in a governmental function when the events at issue in this litigation occurred. *See Moore v. Michigan*, 2014 WL 1260702, at *5 (E.D. Mich. Mar. 27, 2014). Accordingly, the state law claims against Saginaw County must be dismissed because it is immune from liability for those claims.

Long contends that Saginaw County engaged in ultra vires activity by violating Long's Fourth Amendment rights under the federal Constitution, and therefore Saginaw County is not entitled to immunity from the state law claims. Long's argument is unavailing, however.

Long does not contend that Saginaw County is without the power to regulate its jails; instead, he contends that, in this one instance, Saginaw County violated his Fourth Amendment rights by surveilling his client meeting while regulating its jails. But Michigan courts have held that an ultra vires act is one that "the governmental agency lacks legal authority to perform in any manner." *Richardson v. Jackson County*, 432 Mich. 377 (1989). In *Richardson*, the plaintiff argued that the county acted ultra vires by failing to properly warn swimmers of a dangerous drop off, as required by Michigan's Marine Safety Act. The *Richardson* court held that, although

the county violated the specific terms of a law in that instance, the violation did not revoke the county's general authority to operate the beach. *Id.* at 385.

> Improper performance of an activity authorized by law is, despite its impropriety, still "authorized" within the meaning of the *Ross* governmental function test. An agency's violation of a regulatory statute that requires the agency to perform an activity in a certain way cannot render the activity ultra vires, as such a conclusion would swallow the *Ross* rule by merging the concepts of negligence and ultra vires.

*Id*.

Like the plaintiff in *Richardson*, Long has done nothing more than allege that Saginaw County's failure to properly supervise and monitor those in charge of its jail was an ultra vires act. Even assuming that Saginaw County did have such duties, those duties were a part of Saginaw County's operation of its jails—a governmental function. Because Saginaw County had the authority to operate and set policies for its jails, it is entitled to summary judgment on the state law claims based on application of the GTLA.

## V

Accordingly, it is **ORDERED** that Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (ECF No. 31) is **GRANTED IN PART AND DENIED IN PART**. Summary judgment on Plaintiff's claim that Defendants violated his Fourth Amendment rights by surveilling his client meetings in the Saginaw County Jail is denied. Summary judgment is granted on all other claims.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: May 8, 2014

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 8, 2014.

                                       s/Tracy A. Jacobs
                                       TRACY A. JACOBS