UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

LAURENCE LONG,

           Plaintiff,           Case No. 12-cv-15586

v                                              Honorable Thomas L. Ludington

COUNTY OF SAGINAW and
WILLIAM FEDERSPIEL,

           Defendants.
_____/

**ORDER GRANTING DEFENDANT FEDERSPIEL'S MOTION FOR SUMMARY JUDGMENT, CANCELLING HEARING, AND DISMISSING LONG'S CLAIMS AGAINST DEFENDANT FEDERSPIEL IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES**

Laurence Long, an attorney, alleges that members of the Saginaw County Sheriff's Office violated his Fourth Amendment rights by videorecording his meeting with a client in a classroom at the Saginaw County Jail.

Defendant Federspiel[1] has moved for summary judgment on Long's claims against him in his individual and official capacity.[2] Because Sheriff Federspiel is entitled to qualified immunity in his individual capacity, and because the Sheriff's Department is not a cognizable "person" for § 1983 claims, his motion for summary judgment will be granted.

**I**

Laurence Long is an attorney licensed to practice in Michigan. Long has been in private practice since November 25, 1986, and practiced in several areas of law. As part of his practice, Long accepted appointments pursuant to the Saginaw County Circuit Court's Plan for

---

[1] The caption in this case appears to spell Defendant Federspiel's name incorrectly. Accordingly, this Court will use the spelling used by Sheriff Federspiel.

[2] Although both Defendants are represented by the same attorneys, it appears that only Defendant Federspiel is seeking summary judgment. *See* Mot. Summ. J. 1, ECF No. 51 ("Defendant William Federspiel's Motion for Summary Judgment") (emphasis removed).

Appointment of Counsel for Indigent Parties. Three months before the events of this case, in December 2011, Long qualified to be placed on a list to be appointed by the Saginaw County Circuit Court to represent criminal capital offenses.

### A

In February 2012, Diane Messing retained Long to represent her in her divorce case. Long was subsequently appointed to Ms. Messing's criminal case after she was arrested on two counts of operating a vehicle while intoxicated. After her arrest, Ms. Messing was detained in the Saginaw County Jail.

On March 25, 2012, Long visited Ms. Messing and another client in the Saginaw County Jail. Upon his arrival, Long asked Corrections Officer Stanley Powell if Ms. Messing had been seen by medical personnel as Long had requested on the previous Friday, March 23, 2012. Officer Powell responded that Ms. Messing had been seen by medical personnel.

Sergeant Ebony Rasco, who was also present during Long's inquiries into Ms. Messing's condition, became "alarmed" because Long "asked if his client received medical attention and the frequency with which he visited his client." Concerned with Long's behavior, Sergeant Rasco had corrections officers place Long in a room known as the "small classroom," which is commonly used for court video arraignments.

Sergeant Rasco acknowledged that she placed Long in the small classroom because she would be able to observe Long's interaction with Ms. Messing through video surveillance. Long's meetings with Ms. Messing were videotaped and recorded from a remote location by Defendants. The recordings were silent; they did not record any audio.

Neither Sergeant Rasco nor any other corrections officer informed Long that they were recording his meetings. Saginaw County Jail does not have any signs indicating that the small

classroom's surveillance camera is on or that it is recording. Moreover, at least two other criminal defense attorneys acquainted with the Saginaw County Jail were surprised to learn that their client meetings had been recorded.

Sergeant Rasco watched the video feed as officers brought Ms. Messing to the small classroom. She explains that Long and Ms. Messing greeted each other with a hug and then sat down "very close to one another in a familiar sort of way." Sergeant Racso "thought the hug was inappropriate for an attorney and his client." She observed Long and Ms. Messing walk out of view of the camera for several minutes, and then Long pressed the call button so that the officer could retrieve Ms. Messing.

After observing Long's interaction with Ms. Messing, Sergeant Rasco went back to view prior video footage of Long's visits with Messing. She discovered that on March 19, 2012, Ms. Messing had hugged Long and kissed him on the cheek during a meeting.

Sergeant Rasco informed the jail administrator, Captain William H. Gutzwiller, that she had observed inappropriate contact between Long and Messing. Captain Gutzwiller banned Long from visiting Ms. Messing inside the Saginaw County Jail and also decided that if Long wanted to see Ms. Messing, a court transport officer could bring her to the courthouse for a meeting.

Captain Gutzwiller then spoke with Judge Kaczmarek, the Saginaw County Chief Circuit Judge at the time, regarding the allegations against Long. During the conversation, Captain Gutzwiller denied that Long and Ms. Messing had engaged in any "sexual stuff": "I said I didn't say it was sexual, sir, I said it was inappropriate."

After the conversation with Captain Gutzwiller, Judge Kaczmarek requested an investigation into Long's conduct on the video recording. Judge Kaczmarek removed Long from

the Saginaw County Circuit Court's Plan for Appointment of Counsel for Indigent Parties. Long was also replaced as Ms. Messing's attorney of record in her criminal cases. Even though he had been replaced as Ms. Messing's criminal defense attorney, Long continued to represent Ms. Messing in her divorce proceedings.

On November 1, 2012, the Attorney Grievance Commission decided that the investigation into Long's alleged improper conduct did not warrant further action by the Commission and closed the investigation.

## II

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III

Having already challenged the merits of Long's Fourth Amendment claim in their previous motion to dismiss and motion for summary judgment, Defendant Federspiel now contends that the claims against him in his individual and official capacities must be dismissed. Specifically, Sheriff Federspiel contends that: (1) he had no personal involvement in the video

recording; (2) he is entitled to qualified immunity from the individual capacity claim; and (3) the claim against him in his official capacity is duplicative of the claim against Saginaw County.[3]

### A

Sheriff Federspiel first contends that he cannot be liable in his individual capacity because he was not actively involved in the video recording of Long's meeting with his client in the jail. Personal involvement is a prerequisite to the assessment of damages in § 1983 actions; the doctrine of respondeat superior is inapplicable to a § 1983 theory of liability. "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984).

Here, Federspiel's liability under 1983 is premised on Long's allegation that he maintained a jail policy that facilitated violation of his Fourth Amendment rights. Indeed, former Undersheriff Robert Karl acknowledged that the Saginaw County Jail had a "standard operating procedure" where officers would attempt to place attorneys and clients in rooms that had recording capabilities:

> Karl: They have a standard operating procedure, they would place [an attorney] in one of the classrooms that's under monitor as a priority.
>
> Q: And by monitor do you mean video monitoring?
>
> Karl: Yes.
>
> Q: Is that standard operating procedure written?
>
> Karl: I believe it is. I'd have to look it up, I would have to refer to the policies and procedures.

Resp., Ex. 7 at 7, ECF No. 53.

---

[3] Sheriff Federspiel is not seeking summary judgment in favor of Saginaw County. He seeks summary judgment on Long's claims against him in his individual and official capacities only. *See* Mot. Summ. J. 10, ECF No. 51 ("Sheriff William Federspiel is entitled to summary judgment as a matter of law.").

Moreover, Sheriff Federspiel explained that his preference was to have every room in the jail amenable to video surveillance—even rooms where attorneys could meet with clients:

> We have visual contact in the jail almost everywhere and that's a common known factor, it should be anyway that we have visual recording systems throughout the jail. And there are certain parts of the jail that have no video, but that's only due to a lack of funding at this particular time.
>
> And so we felt because of that contact between male and female, whether it's client and attorney privileged or not, that it would be best suited to take place outside of our facility. We did not want to stop them from meeting, we did not want to interfere with that process we just did not want to have that contact in our jail.

Resp., Ex. 6 at 11.

In light of Undersheriff Karl's testimony that placing attorneys meeting with clients in rooms with recording capabilities was "standard operating procedure," and Sheriff Federspiel's testimony indicating his desire to have cameras in all areas, there is sufficient evidence to indicate that Sheriff Federspiel maintained a policy that could allow a violation of the Fourth Amendment to occur.

**B**

Sheriff Federspiel next contends that, even if he had some active involvement in the recording of Long's meeting, he is entitled to qualified immunity. Specifically, Sheriff Federspiel asserts that Long has not shown that the right in question was "clearly established" as required to defeat a qualified immunity defense.

Although violations of constitutional rights by government officials acting under color of state law are generally redressable through an action under § 1983, the doctrine of qualified immunity shields officials from liability "insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560,

567 (6th Cir. 2013). "In determining whether qualified immunity applies, we ask, (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Bazzi v. City of Dearborn*, 658 F.3d 598, 606-07 (6th Cir. 2011) (internal quotation marks omitted). Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity. *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006).

Here, the Court has already determined that there is a material issue of fact regarding whether Long's Fourth Amendment right was violated by the recording of his client meeting. *See* Order Granting in Part and Denying in Part Defendants' Mot. Summ. J. 1, ECF No. 35 ("Because there is a material issue of fact regarding whether Long had a reasonable expectation of privacy while meeting with his client in the Saginaw County Jail, summary judgment on his Fourth Amendment claim will be denied."). Accordingly, Sheriff Federspiel now claims that, even if Long's Fourth Amendment right was violated, he cannot show that this right was clearly established.

**i**

A government official will be liable for the violation of a constitutional right only if the right was "'clearly established . . . in light of the specific context of the case.'" *Binay v. Bettendorf*, 601 F.3d 640, 651 (6th Cir. 2010) (quoting *Scott*, 550 U.S. at 377). A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009) ("The key determination is whether a defendant moving for summary judgment on qualified immunity grounds was on notice that his alleged actions were unconstitutional."). Thus, "there are 'limitations upon the

extent to which a court may rely on holdings in contexts other than the one being considered to demonstrate that a principle has been clearly established.'" *Andrews v. Hickman Cnty.*, 700 F.3d 845, 853 (6th Cir. 2012) (quoting *Ohio Civil Serv. Emps. Ass'n v. Seiter*, 858 F.2d 1171, 1176 (6th Cir. 1988)).

In assessing whether a right is "clearly established," the Court must first look to the decisions of the United States Supreme Court, then to the decisions of the Sixth Circuit, and lastly to the decisions of other circuits. *Ciminillo v. Streicher*, 434 F.3d 461, 468 (6th Cir. 2006). A case "directly on point" is not required. *al-Kidd*, 131 S.Ct. at 2083. There may be instances where "'[g]eneral statements of the law' are capable of giving clear and fair warning to officers even where 'the very action in question has [not] previously been held unlawful.'" *Smith v. Cupp*, 430 F.3d 766, 776-77 (6th Cir. 2005) (quoting *Anderson*, 483 U.S. at 640).

The alleged right must be established, "not as a broad general proposition," *Brousseau v. Haugen*, 543 U.S. 194, 198 (2004), but in a "particularized" sense so that the "contours" of the right are clear to a reasonable official, *Anderson*, 483 U.S. at 640. Here, the right in question is not the general right to be free from unreasonable searches, but the more specific right to be free from visual surveillance during an attorney-client meeting *in jail*—the last phrase playing a crucial role in the instant analysis.

### ii

There is no Supreme Court precedent directly answering the question of whether the Fourth Amendment applies to covert surveillance of attorneys meeting with their incarcerated clients in prison. Long cites to *Lanza v. State of New York* in passing, but does not explain how the Supreme Court's holding in *Lanza* "clearly establishes" the Fourth Amendment right at issue. *See* 370 U.S. 139 (1962).

In *Lanza*, jail officials surreptitiously intercepted a conversation between Lanza and his brother during a county jail visit with an electronic listening device. A transcript of the conversation was later used by a legislative committee to interrogate Lanza about possible corruption in New York's parole system. Holding that the transcript was not subject to suppression on Fourth Amendment grounds, the Supreme Court explained that "a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." *Lanza*, 370 U.S. at 143. Thus, a visitor's Fourth Amendment rights are much more circumscribed than in daily life: "[i]n prison, official surveillance has traditionally been the order of the day." *Id.*

Nevertheless, there are some situations where a visitor to a jail maintains his Fourth Amendment rights: "even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection . . . ." *Id.* at 143-144. However, because Lanza's familial relationship with his brother was not a relationship "endowed with particularized confidentiality," the Supreme Court concluded that there was no Fourth Amendment violation.[4]

Although the Supreme Court hypothesized that there would be certain relationships that would be entitled to Fourth Amendment protections even in prison, the Supreme Court has never identified what those relationships may be. Instead, the Supreme Court provided a general pronouncement that some relationships may be entitled to Fourth Amendment protections in prisons without providing any guidance as to what those relationships may be.

The lack of specificity by the Supreme Court makes its decision in *Lanza* unhelpful to Long. Courts are "not to define clearly established law at a high level of generality." *Ashcroft v.*

---

[4] The *Lanza* decision epitomized the "protected areas" analysis repudiated by *Katz v. United States*, 389 U.S. 347 (1967). The Sixth Circuit clarified, however, that *Lanza* is still good law: "It still appears to be good law that so far as the Fourth Amendment is concerned, jail officials are free to intercept conversations between a prisoner and a visitor. This was the ruling in *Lanza v. New York* and it appears to have survived *Katz v. United States*." *United States v. Paul*, 614 F.2d 115, 116 (6th Cir. 1980) (citations omitted).

*al-Kidd*, 131 S. Ct. 2074, 2084 (2011). In *Lanza*, the proclamation that some relationships are entitled to Fourth Amendment protections is an example of such high-level generality. The *Lanza* court did not identify those types of relationships, nor did it provide guidance on how to identify those types of relationships. *Lanza*'s holding would require a reasonable officer to assume that the attorney-client relationship is one of those special relationships, given that the Supreme Court (and no circuit court) has ever held to that effect. Thus, the assumption that the attorney-client relationship is a relationship "endowed with particularized confidentiality" that is entitled to Fourth Amendment protections requires the use of a high level of generality. Therefore *Lanza* does not "clearly establish" that attorneys have a Fourth Amendment right concerning their meetings with incarcerated clients.

### iii

Nor has the Sixth Circuit taken a definitive position on whether the Fourth Amendment's protection against unreasonable searches applies to the surveillance of attorney-client meetings in jails or prisons. Certainly, the Sixth Circuit has held that visual surveillance can constitute a Fourth Amendment search in some circumstances. *See Brannum v. Overton County School Bd.*, 515 F.3d 489, 494 (visual surveillance of semi-nude students in school locker room constituted a Fourth Amendment search); *Kent v. Johnson*, 821 F.2d 1220 (6th Cir. 1987) (visual surveillance of nude prisoners in shower constituted a search).

But the Sixth Circuit has never addressed the precise circumstance at issue here: whether prison officials violate a visiting attorney's Fourth Amendment rights by recording an attorney-client meeting. Granted, a situation with identical factual circumstances is not necessary for a right to be clearly established; however, the cases cited by Long are not sufficiently specific to provide guidance to a reasonable officer.

Long advances two cases from the Sixth Circuit for the proposition that "it is clearly established that silent video-recording of a person can constitute a search under the Fourth Amendment." Resp. 15. However, once again, this proposition is too general; instead, the appropriate inquiry is whether it was clearly established that visual surveillance and recording of an attorney-client meeting in jail violated the attorney's Fourth Amendment right.

First, Long cites to *John Doe (1-3) v. Dearborn Public Schools*, 2008 WL 896066 (E.D. Mich. Mar. 31, 2008), in which the district court concluded that the right of a public employee to be free from unreasonable searches by an employer was clearly established. In *John Doe*, three male physical education teachers brought suit alleging that the Dearborn Public Schools violated their Fourth Amendment right by installing videocameras in their offices and recording them. The district court concluded that "Plaintiffs have sufficiently shown that they have a constitutional right to be free from unreasonable video searches in their shared office," and that this right was clearly established. *Id.* at *5-*6 (citing *O'Connor v. Ortega*, 480 U.S. 709, 716-17 (1987) (acknowledging that society recognizes that a person enjoys a reasonable expectation of privacy in a shared office).

*Doe*'s case is distinguishable from Long's circumstances. The privacy expectation in one's office is different than the privacy expectation while meeting with a client incarcerated in a publically-maintained jail or prison. The court in *John Doe* relied on *O'Connor*, in which the Supreme Court acknowledged that society recognizes that a public employee enjoys a reasonable expectation of privacy in an office. *Id*. In the instant case, Long is not a public employee, nor was the jail his employer, nor does Long maintain an office in the jail. Aside from the general holding that visual surveillance and recording can be a Fourth Amendment search in some circumstances, *John Doe* provides no specific guidance that would allow a reasonable officer to

conclude that recording Long's meeting with his client in the Saginaw County jail would violate Long's "clearly established" Fourth Amendment rights.

Long also relies on *Brannum v. Overton County School Bd.*, in which the Sixth Circuit concluded that a middle school's decision to install security cameras in the boys and girls locker rooms was an unconstitutional violation of the students' privacy under the Fourth Amendment. 515 F.3d 489, 494 (6th Cir. 2008). The Sixth Circuit concluded that this right was clearly established despite the lack of factually analogous precedent. The court reasoned that "[s]ome personal liberties are so fundamental to human dignity as to need no specific explication in our Constitution in order to ensure their protection against government invasion." *Id.* at 499. But again, the instant case is differentiable. Video surveillance of a meeting with a client in jail is not a Fourth Amendment violation that is so "outrageous" as to render it an "obvious case," as in *Brannum*. *Cf. Beard v. Whitmore Lake School Dist.*, 402 F.3d 598, 607 (concluding no "obvious" violation where students made to strip to underwear to search for stolen money).

Although not cited by Long, the Sixth Circuit has determined that visual surveillance of prisoners[5] may constitute a constitutional violation in at least one case: *Kent v. Johnson*, 821 F.2d 1220. In *Kent*, the Sixth Circuit found a constitutional violation based on the allegation that "the prison allows the female guards to view [the male plaintiff—an inmate] performing necessary bodily functions in his cell and to view his naked body in the shower area." *Id.* at 1222. The Sixth Circuit reasoned that:

> [p]erhaps it is merely an abundance of common experience that leads inexorably to the conclusion that there must be a fundamental constitutional right to be free from forced exposure of one's person to strangers of the opposite sex when not reasonably necessary for some legitimate, overriding reason, for the obverse would be repugnant to notions of human decency and personal integrity.

---

[5] Although *Kent* explored prisoners' Fourth Amendment rights, it is reasonable to assume that a visitor's constitutional rights are at least coextensive with prisoners, if not greater.

*Id*. at 1226. Thus, there is authority in the Sixth Circuit that visual surveillance of nude prisoners may violate the Fourth Amendment's prohibition on unreasonable searches.

The instant situation is distinguishable from the situation in *Kent*, however. Unlike the plaintiff in *Kent*, Long was not subject to the highly invasive search; instead, he was recorded while having a conversation with his client in prison. He was in no way forced to submit to visual surveillance by opposite-sex guards while nude, thereby offending "notions of human decency and personal integrity." Accordingly, *Kent* does not support the proposition that the Saginaw County Jail officials were violating clearly established law.

Although the Sixth Circuit has repeatedly held that visual surveillance or recording may violate a plaintiff's Fourth Amendment right in some circumstances, this general proposition is too vague to clearly establish that a visual recording of an attorney meeting with a client in prison violates his Fourth Amendment right. Given that there is no direct precedent from the Sixth Circuit holding that the Fourth Amendment applies to surveillance of attorney-client meetings in prison, it was not clearly established under Sixth Circuit precedent that the conduct of prison officials recording attorney-client meetings is subject to the standard of reasonableness imposed by the Fourth Amendment.

iv

Long relies on two out-of-circuit cases to support the conclusion that his Fourth Amendment right at issue was clearly established.[6] First, Long cites to *Gennusa v. Canova*, 748

---

[6] Long also cites several out-of-circuit district cases and state cases: *Lonegan v. Hasty*, 436 F. Supp. 2d 419 (E.D.N.Y. 2006); *People v. Harfmann*, 38 Colo. App. 19 (1976); *Case v. Andrews*, 226 Kan. 786 (1976); *People v. Dehmer*, 931 P.2d 460 (Colo. App. 1996); *States v. Walker*, 804 N.W.2d 284 (Iowa 2011); *State v. Sherwood*, 800 A.2d 463 (Vt. 2002); *In re Rider*, 195 P. 965 (Cal App. 2 Dist. 1920); *States v. Davis*, 130 P. 962 (Okla. Crim. App. 1913); and *People v. Moy*, 2008 WL 2891811 (Mich. App. Nov. 13, 2008). However, these state law cases are not a proper reference in determining whether the Supreme Court and the Sixth Circuit clearly established the right at issue. *See Marsh v. Arn*, 937 F.2d 1056, 1069 (6th Cir. 1991) (this Court "places little or no value on the opinions of other circuits in determining whether a right is clearly established"); *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir.

F.3d 1103 (11th Cir. 2011), in which the Eleventh Circuit determined that the recording of a meeting between a non-incarcerated client and his attorney violated the client's and the attorney's Fourth Amendment rights.  Second, Long cites to *United States v. Jenkins*, 178 F.3d 1287 (4th Cir. 1987), in which a criminal defendant claimed his Sixth Amendment right to counsel had been violated when members of a sheriff's department recorded his meetings with counsel.

The Sixth Circuit has made clear that out-of-circuit precedent clearly establishes rights only in "extraordinary case[s]" when the out-of-circuit decisions "both point unmistakably to the unconstitutionality of the conduct complained of and [are] so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting." *Ohio Civil Service Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir. 1988); *see also Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991).

The facts of *Gennusa* are the most similar to those in the instant case.  In *Gennusa*, detectives recorded a conversation between an attorney and her client in the county sheriff's office.  748 F.3d at 1108.  The conversation was being recorded and actively monitored by members of the sheriff's office through a concealed camera, and neither the attorney nor her client knew they were being recorded. *Id*.

The Eleventh Circuit held that the detectives violated the attorney's Fourth Amendment right by recording the conversation, and that it was clearly established that the Fourth Amendment prohibits the warrantless recording of attorney-client conversations between a non-incarcerated suspect and his attorney.  Importantly, the Eleventh Circuit noted that the

---

1988) ("We should focus on whether, at the time defendants acted, the rights were clearly established by decisions of the Supreme Court or the courts of this federal circuit."); *Virgili v. Gilbert*, 272 F.3d 391, 393 (6th Cir. 2001).

conversations took place in an interview room at the sheriff's office and, at the time of the recordings, the client was not under arrest. Thus, unlike the instant case, the recording did not take place within a jail or prison. Indeed, the Eleventh Circuit's stated that "it was clearly established that the Fourth Amendment prohibited the warrantless recording of attorney-client conversations between a *non-incarcerated suspect and his attorney under the circumstances presented here.*" *Id*. at 1113 (emphasis added). In other words, central to the holding was the fact that the client had not been taken into custody by the State.

Moreover, *Gennusa* was decided on April 8, 2014, about two years after the events in this case took place. The Saginaw County jail officials, in light of the undeveloped state of the law at the time of the surveillance, cannot have been "expected to predict the future course of constitutional law." *Wilson v. Layne*, 526 U.S. 603, 617-18 (quoting *Procunier v. Navarette*, 434 U.S. 555 (1978)). Because "the contours of the right" were not clear prior to the Eleventh Circuit's decision in *Gennusa*, Sheriff Federspiel is entitled to qualified immunity. *See Abner v. County of Saginaw County*, 496 F. Supp. 2d 810, 824-25 (E.D. Mich. 2007) (where incidents occurred prior to case law establishing the constitutional right, that constitutional right was not clearly established), vacated on other grounds, 2007 WL 4322167 (E.D. Mich. Nov. 28, 2007).

Long also cites *United States v. Jenkins*, a case in which a criminal defendant attempted to argue that his Sixth Amendment right to effective assistance of counsel was violated when his meeting with counsel in the sheriff's office was improperly recorded.[7] The Fourth Circuit denied Jenkins's claim because he had not shown that he suffered prejudice, as required under the Strickland standard.

*Jenkins* is also distinguishable from the case at hand because (1) it analyzed the alleged right under the Sixth Amendment; and (2) involved recording that took place in a sheriff's

---

[7] It is unclear from the opinion whether Jenkins was under arrest at the time of the recording.

office—not a jail or prison. Here, Long is asserting a Fourth Amendment right to be free from surveillance while meeting with clients in prison. Thus, *Jenkins* does not "point unmistakeably" to the unconstitutionality of the Saginaw County jail officers' conduct.

### v

In summary, existing precedents did not give jail officials fair warning that their surveillance of Long's meeting with his client was subject to the Fourth Amendment's reasonableness requirement, and accordingly the right at issue was not clearly established. *See al-Kidd*, 131 S. Ct. at 2083. Sixth Circuit precedent has indicated that visual surveillance may constitute a Fourth Amendment search, but never has it addressed the more specific issue of whether visual surveillance of an attorney-client meeting in prison may violate the Fourth Amendment. Officer Federspiel is thus entitled to qualified immunity regardless of whether the jail officials' conduct amounted to a violation of Long's Fourth Amendment rights. Accordingly, Sheriff Federspiel's motion for summary judgment with respect to his individual liability will be granted because he is immune from suit.

### C

Sheriff Federspiel next contends that the claim against him in his official capacity should be dismissed because it is duplicative of Long's claim against Saginaw County. Long disputes the contention that the claims are duplicative, instead contending that the Saginaw County Sheriff's Department is a distinct entity separate from Saginaw County. Long Resp. 7 (citing *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985)). Thus, according to Long, he can maintain claims against both the Saginaw County Sheriff's Department (through his claim against Sheriff Federspiel in his official capacity) and Saginaw County. This distinction, however, does not save Long's claim against Officer Federspiel in his official capacity from dismissal.

Although Long's claim against Sheriff Federspiel in his official capacity and Saginaw County may not be duplicative, Long's claim against the Saginaw County Sheriff's Department (through the official capacity claim) cannot survive. That is, even accepting that an official capacity suit against the Sheriff is a suit against the Sheriff's Department—rather than against Saginaw County—the official capacity suit will be dismissed because Long cannot maintain a § 1983 suit against the Saginaw County Sheriff's Department. The Sixth Circuit and numerous district courts have held that "the Sheriff's Department is not a legal entity subject to suit," *Rhodes v. McDaniel*, 945 F.2d 117, 120 (6th Cir. 1991),[8] and therefore Long's claim against Sheriff Federspiel in his official capacity will be dismissed. *See also LaPlante v. Lovelace*, 2013 WL 5572908, at *2 (W.D. Mich. Oct. 9, 2013) (same); *Balbridge v. Jeffreys*, 2009 WL 275669, at *3 (E.D. Mich. Feb. 5, 2009); *Williams v. Kent County Sheriff's Dept.*, 2007 WL 3124644, at *3 (W.D. Mich. Oct. 25, 2007); *Walton v. Wayne County Sheriff's Dept*, 2007 WL 2873342, at *2 (E.D. Mich. Sept. 26, 2007).

Because a sheriff's department is not a legal entity capable of being sued under § 1983, courts generally construe a claim against a sheriff in his official capacity as a claim against the county. *See LaPlante*, 2013 WL 5572908, at *2 (liberally construing pro se complaint against Marquette County Sheriff's Department as claim against Marquette County); *Balbridge*, 2009 WL 275669, at *3 ("Plaintiff's action against Sheriff Heyns in his official capacity should be treated as an action against the County.") (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991)). Here, the Court need not construe a suit against Sheriff Federspiel as a claim against Saginaw County, because Long has already named Saginaw County as a Defendant in his Complaint. Therefore Long will be able to proceed with his Fourth Amendment claim against Saginaw County, even

---

[8] To the extent that *Marchese v. Lucas*, 758 F.2d 181, permitted a § 1983 suit against a Sheriff's Department, this holding appears to have been abrogated by subsequent Sixth Circuit caselaw, such as *Rhodes*, 945 F.2d 117.

though both the individual and official capacity suits against Sheriff Federspiel will be dismissed.[9]

### IV

Accordingly, it is **ORDERED** that Defendant Federspiel's Motion for Summary Judgment (ECF No. 51) is **GRANTED**. Long's claims against Sheriff Federspiel in his individual and official capacity are **DISMISSED**.

It is further **ORDERED** that, because a hearing would not significantly aid in the disposition of the motion, the November 20, 2014 hearing is **CANCELLED**.

s/Thomas L. Ludington  
THOMAS L. LUDINGTON  
United States District Judge

Dated: October 27, 2014

---

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 27, 2014.

s/Tracy A. Jacobs  
TRACY A. JACOBS

---

[9] Defendants do not challenge whether Sheriff Federspiel's alleged policy is sufficient involvement on the part of Saginaw County to impose liability under *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 694 (1978). Accordingly, the Court need not address this issue.